Good morning, Your Honors. Michael Crowley on behalf of Mr. Alba, who is not present. I will watch the clock, but I'll try to preserve it. Are you and Mr. Forrester's counsel dividing time or what? Yes. We're going to attempt to divide time. So I would like to try to hold on to a couple minutes of rebuttal. Well, how much time do you – you've got 20 to allocate between the two. So what are you taking, 10? Are you taking 10 or what? That's our initial negotiations, depending on questions here. All right. Your Honors, I would focus in initially, both on my initial argument and I think the most important issue here, and that's the computer surveillance that the government called a pen-whisker. You're representing? Mr. Alba. Alba, that's right. Right. It was actually his computer that initially was tapped, and that's essentially what happened. I could just as easily call what they did there a wiretap as the government calling it a pen register. And that is pretty much the crux of the issue here is the constitutional dimension involved in this new electronic age where everybody is using e-mails to communicate and how much does it apply. The government relies on falling back on the decision, 25-year-old decision, concerning telephones, the now somewhat archaic landline telephone technology. And the decision was very specific to that and very narrowed in that regard. And in fact, it was in reaction to that decision that the Congress passed legislation to make the government go in and make a showing before they could just automatically put these pen registers on. So it's your contention then, counsel, that the analogy between pen registers and what happened here is an error? Is an error. Absolutely. And why do you think that? Okay. Well, several reasons. First of all, the definition of a pen register, first defined very narrowly by the Supreme Court in Smith v. Maryland when they said the Fourth Amendment doesn't apply. Secondly, in the legislation that Congress then passed limited it specifically to telephones and the communication that goes on the telephones. And of course, that was a big part of the rationale behind the decision was the fact that it's just telephone numbers that a person would not have an expectation of privacy in just putting a number out in order to connect with someone else, unlike an e-mail where a person certainly has an expectation of privacy as to where it's going. And in this case, also, where they're going on the Internet, which is part of the ---- I'm not sure I follow that. The pen register picks up just numbers. It picks up numbers dialed. Right. Well, that tells you then it doesn't take a rocket scientist to go figure out where that number is, where it's gone. Where it's gone, exactly. So what's the difference between that and an e-mail? Okay. The difference is, first of all, as to the e-mail, we don't know what information was sent out there. If the declaration that was filed by the computer expert, a former law enforcement officer in this area, was that the information that went out contains, among other things, information as to potentially the subject matter of what was there, who it was cc'd to. And then also, this was not just limited to e-mails. This was also Internet sites that went on, both in the declaration and in the only thing we know, which was in the warrant application. That's all we know about what was sniffed out. But as pointed out in the declaration once again, an entire, this is not a child porn case, but a child porn case could be made out by the addresses of the pages that they went to. All they do is go to those pages and show that there was child pornography. What if a pen register picks up, what are those, 996 or whatever? And it's a child porn, you know, phone sex type of thing. What's the difference? I guess that that is a, that's a possibility that could arise, except that all of those that we know of require some additional identification and they require a credit card or something like that. It's not just the number there. You could accidentally dial that. You wouldn't be able to do it in that regard. Although there is somewhat of the analogy, but I don't think that was foreseen by the Supreme Court in saying that the Fourth Amendment did not apply in that situation. The concept is that these are kind of general things. They're available in the public sector. I mean, you can, people can buy phone numbers. People can buy e-mail lists and do. As a matter of fact, every mass marketer in town does that. What expectation of privacy did your client have that's any different than that? It's not just the e-mail address, a person's e-mail address. You're certainly right that those are available quite readily. And there's lots of ramifications concerning that. I sit on the Ethics Committee and we're grappling with putting an ethics, I mean, just your e-mail on the website. What does that mean as far as ethics? But this is, as far as we know, took a lot more information than that. And that's what's in the declaration, spells it out as to what could be known. Can you point me to anything in the record that would help me understand what more than the e-mail appeared, what did they find? The specific thing would be the excerpts of record of ours, pages 52 through 62, which is Mr. McKay's declaration, who, as I pointed out, is a former law enforcement who worked in the Customs field, not in the Customs field. He was a special agent for U.S. Customs. And as he points out. 52, did you say?  I hope that's correct. That's Lawson. Isn't that Lawson? Oh, that, Marcus Lawson. What did I, did I say a different name? You said McKay. That's right. That's the government's expert. I shouldn't be saying that. Is there a different page then, or these are the correct pages? Yes. And in there he details, including what I stated about, from. What page, what line? What are we talking about? Well, let's go to, I don't have it. Paragraph 19. It would be page 8 of the affidavit, which I think is still, the page number should still be at the bottom, pages 8, 9, and 10. What's the declaration? Oh, that, oh, the declaration. Where the discussion concerns the packets that, they travel in packets, and the information is there. I think it's very likely that included in that was also the subject matter, because that's in the headers. That may be, but aren't we talking about whether there's an expectation of privacy? Right. So if I know when I'm going into this Internet, this new age Internet, I'm revealing one heck of a lot of stuff. Don't I voluntarily give up any expectation of privacy in that? Well. I have no idea who, and, you know, when I go out on the Internet, it may be foolish to do so, but I don't do it with any, I say I in a generic sense, don't have an expectation that somehow it's private. We're at risk when we're out there. Well, I guess we differ in that regard, because as we have seen now, when e-mails are properly come about in discovery through warrants and through probable cause hearings and things like that, people put all kinds of information from very private to trade secret information to. It's a reasonable expectation. I believe it is. And why would people put all of these. Well, where do you put it? In other words, the packets are what? Are you saying because the packets go beyond what? Is it getting into the. . . Other than just the address. Let's take an e-mail, just so I understand what we're talking about here. An e-mail has an e-mail address. Correct. On the first line. It has CCs. Correct. It has subject line, array line, or whatever you can or may or may not fill in. And then it has the message body. Right. Okay. Now, are you. . . Does this declaration, is it saying that the. . . And it has file attachments and the like. So are you saying that this warrant encompassed all of the content of the e-mail? I don't know. Because I didn't even get the affidavit or the copy of the warrant. That was denied to me. It is opined that that's what would happen based on the typical software that's used to filter out this type of information in his experience, the expert's experience. So that's the best I can do on that. How do they physically. . . They actually physically, the way I understand it, and much of this is in the record of the experts, physically go to the Internet provider and download in what's called a mirrored port, where all the information that's coming from the computer, when it goes through the initial Internet provider, the person that's providing you service, goes on to a separate hard drive for the government. So what you're saying basically is that there's the potential anyway, on the record as we have it, that going beyond a pen register, it's actually intercepting the content. Well, there's no doubt they do intercept the content. But then they use software, at least according to the representations of the government, they use software to ferret out the content directly embedded into the e-mail. That's what has been represented by the government. No, I'm still focused, quite frankly, if the Court is going, is there a problem? Maybe if we get down, further down the road. But I'm just focusing in on whether, even if they do the filtering correctly and even if all that is up there, that this is not a pen register. This is not what we refer to as a pen register. And specifically, of course, it's called a pen register by the government, specifically to get the Fourth Amendment out of the way. But I'm trying to get at. In other words, you're saying that it's beyond a pen register, even if they don't get into the body of the. . . Absolutely. And in fact, the little bit of case law that's out there, I really think this is a first impression, but in areas around where we're feeling our way through it, cell phones have come about. They have curtailed the right, for example, to determine the location of a person, which they can do based on a cell phone, where the person is using the cell phone. That is a legitimate, reasonable expectation of privacy as to where you're using the cell phone without having a proper warrant in order to do that. And that's basically what we're asking for.  Okay. You're into. . . I'm. . . Are you running it on 10 minutes? No, you're right on time. So you're into. . . Oh, so I'm into my colleagues. Already. I'm already stepping on it. Good morning. Ben Coleman. I represent Mr. Forrester. I'd like to focus on the Feretta Waiver issue. The longstanding law of this circuit that to take a valid Feretta Waiver, the district court needs to advise a defendant of three things, the dangers and disadvantages of self-representation. That was done here. That was done here, and the district court did a good job of that. The problem here is the nature of the charges and the penalty. Correct. Absolutely. And in Erskine, I don't know if I'm pronouncing that correctly, the district court also did a good job of advising the defendant of the dangers and the disadvantages of self-representation, but got the penalties wrong. And in this case, we have a situation where the defendant, nothing was said about the nature of the charges at the Feretta Colloquy, and the district court erroneously advised the defendant about the potential penalties. The district court told the defendant that he was looking at 10 to life when he was really, initially at that time, only looking at zero to 20. Here's my just sort of conceptual difficulty. I understand the law. Erskine is an understatement of the penalty. Correct. And in that case, that would affect, you know, if it's understated, then the defendant seeking self-representation would obviously have been, I'm saying obviously, if it's understated, the defendant's going to perhaps be lulled into the notion the stakes aren't as great. In this case, the error was on the side of overstating it, which one would think would be more in the line of causing him to think very seriously before he would decide to run that risk and if the penalty is lower. So I know there's no harmless error analysis here, but it just seems in the context of omitting the, of overstating the penalty, whether there's really any harm in it. All right. Well, I think I'm going to directly answer that question. The one thing I want to preface it by saying is that we, I think the Court needs to look at a combination of the two errors here, both the nature of the charges and the penalties. So we have two flaws, but just, and I don't, and I know in the briefs I kind of focused in on penalties and I focused in on the charges, but I think it's sort of a totality together. But with respect to this issue of the overemphasis of the penalties, I think there are a few problems with saying, well, it's okay because it was an overemphasis rather than an underemphasis. The first is I just think from a policy perspective, it's bad, it would create bad law to say, well, overemphasis is okay, because then all the courts would have to say is, well, look, you should just assume that you're going to be getting life in this case. But in any event. That's sort of a reductio ad absurdum argument. But putting aside, the way the defendant may manage his case, not only select to represent himself, but also look at his case and what he should do. Should he go to trial? Should he plead guilty? Those type of things are going to be heavily impacted by the advice that the district court gives the defendant. You know, a defendant who's looking at zero to 20 years, like Mr. Forrester was, could potentially say to himself, well, you know, if I plead guilty and ask for mercy from the court, I may get not such a bad sentence and I'm 50-some-odd years old and maybe I'll be out before I'm 60 or somewhere around there and I can still have the rest of my life. If he's told that he's looking at 10 to life, the odds are a lot higher. He's going to say to himself, there's no way I'm getting out of jail for at least 10 years, and it may be all the way for the rest of my life. I'm going to take the risk and go to trial. So I think it's important. That might support an argument that leads to I didn't plead guilty because I was misinformed, but your client hasn't made that protest. The only effect that's been offered is on his selection of whether or not to represent himself or whether to have counsel. And I just don't understand how the overstatement could lead defendant to the wrong decision on that. I mean, the point of this is colloquy, among other things, to try to discourage defendant from electing to represent himself. How does overstatement cause a problem with that? Well, first of all, I think the inquiry is whether the defendant made a decision knowingly and intelligently. The inquiry shouldn't be would this be more likely to lead him to choose self-representation or more likely to dissuade him from choosing self-representation. It's hard for me to figure out what the harm is in terms of overstatement with regard to this decision. Well, I've analogized it also to I've cited some cases from other circuits that are in the guilty plea context and that overemphasis of penalties can affect that decision and affect the way you handle the case. And I think that, obviously, we're looking at. I understand that your client's not complaining about that. Your client's not saying, gee, I went to trial when I wouldn't have if I hadn't been misinformed by the court. And that's a potentially appealable issue. But that's not an appeal being brought by your client. Your client is complaining here with regard to not being properly informed about representing himself. So it's the decision about representing himself that seems to be at issue. And how is that adversely affected by being given an overestimate of the sentence? It's our position that it wasn't a known and intelligent decision. He didn't know what the penalties were, and he was incorrectly told he won penalties. But even if the court says, well, we're not the penalties were not troubled by because it was an overemphasis and I think the court should be troubled by it, he still wasn't advised of the nature of the charges at all. There was no mention of the nature of the charges. So that in and of itself renders the colloquy defective, and it's an unknown and unintelligent waiver. So even if the court wants to set the penalties issue aside and say that didn't render it unknown and unintelligent, you still have the problem of the nature of the charges. Now, the government, that should end the analysis. The government is going to say, well, if we look at the rest of the record, we can determine that he adequately understood the nature of the charges. It's our position that, number one, and I think this is clear under Erskine, the after the fact parts of the record aren't relevant. What's relevant is the portion of what he knew at the time. And in this case, all we've got are basically an arraignment where he never said anything and actually had a lawyer that stood in for him. I mean, that's all we've got. The government has tried to piece together some other parts of the record and have indicated, well, this guy's an experienced criminal. He's been around the block. He knows what's going on. But the case law makes it clear that that's not sufficient to establish a known and intelligent waiver, to establish that the defendant understood the nature of the charges. And one thing I do want to say is, you know, I obviously sympathize with district courts, and I know that they've got to do things on the fly sometimes and that, you know, we've got this three-factor process and we can sit back after the fact and say, well, they didn't get it right. But there's also, I think, an obligation on the government here as well. I mean, they're there. They know that this is coming. This wasn't like a spur-of-the-moment thing. The court knew that the defendant was going to be asking to represent himself. And when that's the case, you would think that everybody would be on the same page with this well-established law to know that you have to advise the defendant of these three things and you have to get the penalties correct. And that just wasn't done in this case. And the law is that when it's not done correctly, automatic reversal is required. And the case should be sent back for a new trial. What if the judge had said you can have up to 21 years and it was only 20 years? Would that be reversible error? In other words, does the judge in this colloquy have to be exactly right? It's our contention that the judge should be right. That the defendant, when you're making a known and intelligent decision, the basic thing is what is the penalties that I'm facing? The defendant should understand that. Whether it's a year too much or a year too little, I mean, I guess the flip side would be, well, what if the defendant was told 19 years when it was really 20? I think the defendant should know what it is, what it is that he's looking at. But in this case, even putting aside the penalties, we've got the nature of the charge problem. And that in and of itself is a totally independent flaw that requires a reversal in this case. And I'll save the remainder for myself. Do you view Erskine as being, in effect, mandatory, jurisdictional? If you don't comply with every prong, we must reverse? I believe that Erskine and the other cases in this circuit say that if the three, if those three elements are not established, reversal is required. Now, there is a rare exception, which allows the court to look at the entire record leading up to the Feretta Colloquy to see what the defendant understood at the time. But if those three factors are not covered, and the rest of the record before, in these rare cases, the rest of the record beforehand doesn't reveal an understanding of those three things, then reversal is required, yes. Thank you. I'll give you each a minute on rebuttal, since you've had to split your time after you hear from the government. I don't want you falling asleep during the government's arguments this year. I think that's highly unlikely. Good morning, Your Honors. Todd Robinson. I'm an assistant United States attorney in the Southern District of California. I represent the United States in this appeal. I'll cover them in the sequence that they were covered by my colleagues. First, with respect to the computer intercept, I think it's important to clarify what exactly happened during the course of this investigation, and the record bears this out. It was a two-step process. The first step was that the United States government applied for and received from Chief Judge Huff in the Southern District of California, pursuant to the Pen Register Statute, 18 United States Code, Section 3127, a pen register on Mr. Alba's computer. And that pen register was limited in terms of the information that was obtained. That pen register was obtained by the United States government on May 3rd of 2001. Limited information derived from that pen register was then put into a Title III affidavit, wherein the government sought and obtained a court order pursuant to Title III, that is, 18 United States Code, Section 2518, full-blown electronic intercept authority on that very same IP address, that is, the computer belonging to Mr. Alba. So there was a two-step process, and I think the process is being blurred by counsel for Mr. Alba. The first part of that process, the pen register process, the only information being intercepted by the United States government, as set forth in the record, was addressing information, that is, who was communicating with Mr. Alba via e-mail. The total amount of information being passed, not the content of that information, just the volume of information, and that's analogous to the duration of a telephone call. When you have a pen register, you get the number called or the number being dialed in on a trap and trace. In this case, we had the address to which e-mail was being sent and the address from which e-mail was being sent. And the duration of the call, that is, the functional equivalent of the duration of the call, the amount of information being communicated. Now, I agree with the Court's position that addressing information with respect to e-mail is akin to telephone numbers. Addressing information, the third thing that was being intercepted pursuant to that pen register authority was the IP, the internet protocol addresses of the websites being accessed from Mr. Alba's computer. That is, he went to chemical sites to purchase chemicals for the manufacturing of ecstasy. He went to chemical sites to order laboratory equipment. And again, it was only after the fact that the government obtained full-blown Title III authority to intercept the contents of the electronic communications to and from that computer that it became evident what the purpose of going to those sites were. So what we were getting during the initial phase, that is, May 3rd through July, when the pen register was in effect, was only the addressing information. And as a legal matter, that information is absolutely indistinguishable from that type of information that does not implicate Fourth Amendment concerns under the pen register statute. For example, if Mr. Alba communicated with chemfinder.com, you get an IP address. And all of these terms are defined in the government's papers at the excerpts of court record page 54 through 57. And these are unique terminologies, I understand. What we had was a pen register on an IP address, that is, a sequence of numbers that identifies this computer when it communicates with the internet. And so what we were getting were internet sites that were being accessed from that computer. Only through resolution of those IP addresses communicating with Mr. Alba's computer were we able to learn what sites he was going to. So you got numbers, not names. Exactly. When we have a pen register on a telephone, we get the telephone number. We then have to go to a database to find out who the subscriber to that telephone number is. It's no different from getting an IP address communicating with the target computer and then going online and resolving that IP address to find out who it is he's communicating with. You said you got the address, you got the volume, and then you got the IP address. What was the IP address? The email address. So the email address would be chemfinders.com. No, the email address would, if he was talking to co-conspirator at hotmail.com, we would get that address. We would not get the subject matter of the email. Joeblow at hotmail.com. That's correct. That's what you'd get. That's what we would get. And that would be the alpha. Right. Okay. And the judge's order specifically limited the take to that specific information. Exactly. I want to follow through. Yes, Your Honor. So you get the alpha address, and then you get the volume, and then you get the IP address. So the recipient, and that's in numbers. I want to make sure I understand the difference between the email address and the IP address. Yes. The IP address is an address which identifies either a website or a computer when it communicates over the Internet. Right. But if I'm sending an email to joeblow at hotmail.com, what am I getting? So you get something from Hotmail as well. No, I just get joeblow at hotmail.com. Okay. Where does the IP address come in? The IP address is what lets me identify the computer from which that communication is coming. So the IP address, Mr. Alba's IP address, was the subject of the court order. I see. So it's his IP address. His IP address. And we would also obtain the IP addresses of businesses. And so his computer might be generating more than one IP address? His was only generating one. There is the difference between a static and a dynamic IP address. He had a static. Okay. So we only had one IP address that we had the court order for. Some services have dynamic. That is, every time you connect with the Internet, you're assigned an IP address for that session. But that was not the case with respect to Mr. Alba's computer. And that's the way that you could identify that, in fact, this was coming from his computer and tie it to him. That is correct, Your Honor. Okay. And then, based upon that information and the other information developed during the course of the investigation, Special Agent Coffey, who was one of the case agents on this case, submitted a detailed 45-page affidavit pursuant to 2518 of Title 18 to get full-blown Title III authority for that IP address. And that's when the United States government began to intercept the electronic communications to and from Mr. Alba's computer. And the representation is made in Mr. Alba's pleadings before this court that he never received copies of that documentation. Let me be clear what he received and what he did not receive. He did not receive the government's pen register pleadings because those pen register pleadings are not subject to discovery. He did, however, receive all, including the ones involving his computer, the pleadings concerning the full-blown Title III authority on his computer. And that's demonstrated by the record because the affidavit to obtain that first court authorization submitted by Special Agent Coffey was submitted to Judge Gonzalez on July 6th of 2001. And not only was he provided with that during the discovery process itself, but the entire affidavit that was submitted to obtain that authorization was appended as Exhibit A to a motion response filed by the government and district court on November the 26th of 2002. That appears in the excerpts of court records at page 28 through 97. So the representation that he was not provided with these pleadings so that he couldn't litigate those pleadings is simply belied by the facts of the record and the facts of this case. He was entitled under Title III to litigate the propriety of the court order authorizing the full-blown intercept because that implicates Fourth Amendment concerns. The government readily concedes that. He was given all of that information. He and the other defendants litigated those very issues before the district court. So that is not an issue that's before this Court. The only issue is whether or not the initial pen register on that computer comported with the Fourth Amendment. And I submit to this Court that it did, in fact, comport with the Fourth Amendment. If there are no other questions with respect to the computer intercept, I'll move on to the Feretta issue. Okay. With respect to the Court's inquiry as to whether or not Mr. Forrester wanted to proceed without the assistance of counsel, it was conducted in a bifurcated two-process. Judge Whalen first heard Mr. Forrester's desire and the factual basis, therefore, on the 23rd of October. And that was a very involved hearing wherein Judge Whalen went through the dangers of self-representation, the pitfalls of self-representation, and basically tried to talk Mr. Forrester out of self-representation. He advised him of the penalties attendant to the offensive conviction, and the government concedes that those were over-advised. It's unfortunate that it was purely a function of the fact that these defendants were involved in manufacturing laboratory site, which was intended to generate revenue in the amount of $8 million per month. This was an extraordinarily large lab. And therefore, from the judge's perspective, it's a drug case, it's a huge drug case, and so he therefore advised Mr. Forrester, albeit incorrectly, that this was one of the most serious drug cases which would call into question the 10-year mandatory minimum up to a life term of imprisonment. So how come the government didn't correct the judge? Your Honor, I think the representation was made that this was a noticed hearing where the government was aware of what was going to take place. It was not. We went down to court not knowing what was going to take place, and Mr. Forrester was there by himself, at which time the court conducted the Ferretta hearing. It's unfortunate that the government did not, that I did not correct Judge Whalen when he so advised Mr. Forrester, and I wish I had. But at that point, we were trying to figure out what was going on, and the court proceeded upon the inquiry, having done many of these in state court on its own. Well, okay, here's the dilemma. There's no harmless error escape valve on this, at least as I understand our precedent. That's correct, Your Honor. Okay, so it's essentially a structural error case, and we do have, as counsels argued, there's no set formula, but there are three elements that have to be communicated. And Judge Whalen clearly did an excellent job on the nature and risks and all of that kind of thing, but the two omissions are the nature of the charges and the incorrect statement of the penalty. So you say it's unfortunate. It is, but there is some authority anyway that a misstatement of the penalty is giving the incorrect information and therefore doesn't carry the day on advisement of penalty. You can talk more about that. And then, as counsel argues, there's nothing in the record to show that he was actually advised of the charges, and you, in fact, said this is a very complicated, big deal case. Where's the evidence that this guy knew exactly what the charges were that he was facing? Yes, Your Honor, with respect to the advisement of penalties, the inquiry is not whether it was a strict compliance with the advisement of penalties. For example, in Mr. Forrester's case, at the time that he decided to represent himself, the penalties were zero to 20 years. Thereafter, the government filed notice pursuant to Section 851 of Title 21 that it intended to seek an enhanced penalty based upon Mr. Forrester's many prior felony drug convictions. Therefore, even had Judge Whalen properly advised Mr. Forrester at the time of the Feretta hearing that it was zero to 20, that advisement would have, in fact, turned out to not be true based upon the posture of the case at the time of sentencing. What was the gap in time? The gap in time, the initial advisement took place on October the 23rd of 2002. The 851 enhancement was filed sometime thereafter. It was filed on July the 3rd of 2003. So it was after both of the hearings where Mr. Forrester was engaged in the colloquy with the district court about the decision to represent himself. So that cuts against a strict interpretation. Sorry, what was the second hearing? The second hearing occurred on March the 7th of 2003, which really speaks to the extent to which Judge Whalen was concerned with Mr. Forrester's decision to represent himself, because Judge Whalen calendared that hearing, that is, the March 7th hearing, sua sponte, on his own. Mr. Forrester didn't ask for it. The government did not ask for it. Judge Whalen was concerned that Mr. Forrester was representing himself in this very important case and put it on calendar just to make sure that Mr. Forrester That was noticed. It was noticed to the extent that we were told we were going to have a hearing. Again, you didn't know the substance of the hearing? No, and I don't mean that by way of excuse. No, I'm trying to understand. There were two bites at the apple to get into the proper penalty and get into the nature of the charges. Yes. As far as I understand it, the first hearing was a surprise. The second hearing was noticed, but the content wasn't. You didn't know it was a reenactment? No, I did not know the purpose. It was a reenactment of the revisiting of the Ferretta waiver. No, Your Honor, Judge Whalen put that on calendar on his own motion. And then you filed your enhancement how many, almost what, nine months after? Yes, just before trial. The government did not file that until immediately before trial. By then he'd already been representing himself. So you're saying now then he knew what the penalty was, at least it was then being sought. But meanwhile, for the nine months or whatever after he had been representing himself, that was with the misinformation about the penalty. What about the charges? Yes, I don't mean to say that the filing of the 851 notice can be bootstrapped into his knowledge at the time of the Ferretta waiver. I know you're not saying it, but you're saying that you said that it would have been erroneous because it ultimately got changed or would have been mooted out. That's true. But that's not the issue. The question is what did he know at the time he made this decision? I would agree to the extent that the inquiry is what did he know at the time, but the true inquiry under the Ferretta decision is whether the waiver was knowing and intentional. And nowhere in the Ferretta decision is there the three-prong factor in Eskreen or Ballew. And, in fact, Eskreen itself, the court said, acknowledged the fact, we have never required district courts to recite a particular script when making their inquiry. Each formulation recognizes that careful assessment is essential to protecting the concurrent Fifth and Sixth Amendment rights, and that appears at page 1168 of that opinion. So there is no strict formulation. And, in fact, in the rare circumstances, the court can look at the entire record. And that is particularly appropriate in the case with Mr. Forrester because ten months, for ten months prior to his decision to represent himself, Mr. Forrester was assisted by counsel, he was assisted by a private investigator, and he was also assisted by a legal assistant for his attorney. The record makes clear that he was actively engaged in his defense. He had assessed the evidence against him. He knew that his case was proceeding perhaps in a different direction from that of his co-defendant, Mr. Alba. That's documented in correspondence. So this is the type of unique case which brings it outside the scope of the usual inquiry. The cases that are cited in the defense briefs are cases where the defendant, in the early stages of his representation, decides, I don't want the assistance of an attorney. I want to represent myself. This is markedly contrasted with that. He had four court appearances where the district court ruled on 35 different motions. Quite clearly, Judge Whalen knew that Mr. Forrester was acutely aware of the nature of the charges against him. And the extent to which the defense cites Rule 11 plea colloquy cases that say you have to advise a defendant of the elements of the offense to determine whether or not he knows the nature of the offense. I'll buy that, but I want to revisit what you read from Erskine, because Erskine says, in order to deem a defendant's Faretto waiver knowing and intelligent, the district court must ensure that he understands, one, the nature of the charges against him, two, the possible penalties, and three, the dangers and disadvantages of self-representation, citing Ballew. So that's the Ninth Circuit formulation of Faretto. Those are the fundamentals. How you wrap them in language is true. There's no script, although I know that I was on a panel where it was suggested, at least in the Rule 11 colloquy, there was a suggested way of making sure that the bases were checked. And I think the problem here is you're resorting now to the exception, but as I understand what you're trying to argue is that it doesn't have to necessarily hit all those three points under the no script. No, Your Honor, it should hit those three points, and that guarantees that the waiver is knowing and intelligently made. Exactly. So where do you say we have any record evidence that he, that the district court ensured that he knew the nature of the charges and that the district court ensured that he understood the accurate penalty? Mr. Forster was present through 10 months' worth of court proceedings wherein the charges against him were discussed. Well, that may be, but that's not what this says. It doesn't say that he was there. The idea is to ask the defendant, you were there. Were you awake? Were you listening? Did you understand what the attorneys were saying? Do you understand that the charges you are facing, there's no interplay between the district court and the defendant. That's the problem here. That is the preferred procedure, but in the limited third, it's required. It is not required, Your Honor. I would submit that in the exceptional circumstance, when you don't have that specific advisement by the district court, you can look outside the record as to what other facts existed. And so if the defendant acknowledged at the time of sentencing that I've known all along. Okay, that's true. Is that what he said? No, but the record. What on the facts of this record do you have that he knew, has admitted that he knew or has acknowledged that he knew, other than the circumstantial evidence that the defendant was in the courtroom? Just being in the courtroom is not sufficient, as I understand our cases. It wouldn't make any sense. Defendants are always in the courtroom. So if that's all it takes, you could blow past the three requirements of Erskine and just say, well, no, the defendant's been in trial all this time.  If he was passively in the courtroom and that was the only record that this court had before it in terms of what was going on in his case, then I would submit that it was not. Okay, so what is it specifically that you have that shows that this defendant exhibited anything to show that he understood the nature of the charges? It's just the penalty, we all know, is wrong. His unusually active participation in his defense is documented by the letters that the government submitted as part of the excerpts of court record. What does that say about his knowledge of the nature of the charges? Because on his behalf, his attorney filed substantive motions that were challenging the government's evidence in this case. It discussed the charges that were pending against him. The motions did? At all of the motion hearings, it was clearly evident that it was a conspiracy to manufacture and distribute ecstasy. And I would note that this offense is characterized as a difficult offense to grasp. It's not a difficult offense for someone who's been thrice convicted of felony narcotics offenses, who's actively participating in his defense, and who is demanded to read and review each and every pleading submitted by his attorney. Are there pleadings that actually show and state the nature of the charges? Yes. Is that in the record? Can you tell us what they are specifically? Yes. In all of the government's pleadings, there is a statement of the charges pending against the defendant and when each one of the defendants were arraigned on the various indictments. And I would direct the court to, for example, page 29 of the government's excerpts of court record. And this appears in all of the government's motion responses, where a statement of case includes the charges against the defendant. And there it speaks to defendant Alba being charged with a CCE offense and count two charges the rest of the defendants with participating in a conspiracy to manufacture and distribute ecstasy, a Schedule I controlled substance, and then cites the statutory violations. So that appeared in each. That's Alba. Pardon me? That's Alba. Alba's in count one on the CCE. All the other defendants, including defendant Forrester, were charged in count two with a conspiracy. That's recited in these papers? Yes. Okay. And what's the evidence that he reviewed those? He wrote his attorney correspondence asking his attorney to copy him on all motions that were being filed on his behalf. And I don't have a cite to the record, but it is in the government's pleadings where that is, that letter itself is part of the record. Counsel, whose obligation, whose burden is it under Erskine to see that the three-pronged requirement set out in Erskine has been fulfilled? Is it the government's? Is it the court's? Is it the defendant's? Whose is it? In the district court, I would assume it's the district court's burden, but clearly the government has an interest in making sure that the record is clear for appellate purposes. It's clearly not the defendant's burden, is it? No, it is not. So in this particular instance, I know you're making a valiant effort to find where he knowingly admitted that he knew what the charges were. Yes. But is there anything in writing or in the record where the defendant specifically stated, I've seen these pleadings, I know what this is, I know what I'm charged with, or are we just left with conjecture that he had to have read it because he got copies of it? We're left with, I wouldn't characterize it as conjecture, but with the reasonable assumption that because Mr. Forrester was so actively participating in his defense, that he knew exactly what the charges were against him. And Judge Whalen, going through the colloquy, was very much aware of the fact that Mr. Forrester was so actively engaged in his defense, he knew exactly what the charges were against him. And when he did this plea colloquy, he did so trying to talk Mr. Forrester out of representing himself. And the fact that he was so aware of the charges against him is relevant to the extent that, even in the Balleau opinion, the Court goes on to say that, I'm sorry, I lost my page, that Judge Kaczynski and Judge Hall, in their concurring opinion, in the Balleau opinion, that is the one that sets forth the three-prong factor. And it's a three-sentence, and I'd just like to read it to the Court. District courts are well aware of their duty under Ferretta to make sure a defendant who wants to represent himself knows what he is doing and makes his choice with eyes wide open. District judges deal with criminal defendants every day. They are in the best position to evaluate whether the defendant's decision is made knowingly and intelligently. They can consider the level of understanding demonstrated by the defendant, his background and prior experience with the legal system, the deliberation with which he has made the decision to proceed without counsel, and his seriousness of purpose. We ought to give a district judge's determination greater deference and rely far less on rote recitation of mechanical formulas. And the Ninth Circuit has never required the rote recitation of a mechanical formula. And indeed, in the Ferretta case itself, there is nowhere discussed anything other than the fact that a district court accepting a waiver must ascertain that the accused knowingly and intelligently chose to forego the benefits of representation of counsel. Although a defendant need not himself have the skill and experience of a lawyer in order to competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation so that the record will establish that, quote, he knows what he is doing and his choice is made with eyes wide open. Judge Whalen bent over backwards, actually calendaring a second hearing to ensure that Mr. Forster knew exactly what he was doing and the record confirms that. That's why this is kind of unfortunate because he clearly did bend over backwards to try to explain this. The thing that at least I'm wrestling with is you've got a three-pronged test that seems to be jurisdictional. The government bears the burden to show that he knowingly got that information. One is the length of the sentence. The other has to do with the nature of the charges. And I'm still struggling with, other than what I would call conjecture, I'm not seeing any evidence where the defendant admitted that he understood this. I know he got the pleadings very likely. He was obviously a very active person. It may be a sad and unnecessary expense. But the reality is he has rights under the law, and the Erskine case is pretty clear about that.  Why am I wrong? You're wrong to the extent that the record as a whole demonstrates that Mr. Forster was, in fact, aware of the nature of the charges pending against him. He was charged with a simple offense of conspiring to manufacture and distribute ecstasy. The evidence at trial was that he formed the laboratory. He knew he was manufacturing ecstasy, and he also distributed that ecstasy. He knew the charges pending against him. There's no other way to read this record, and I would agree with the Court that there is no specific statement I can point to to show that he knew that. But read as a total record, and in its totality, there can be no other conclusion that Mr. Forster knew exactly what he was facing when he decided to represent himself. Okay. You're well over time. Thank you very much, Your Honors. It's an important case. I'll give each of the others on the other side some time to reply. I just wanted to correct one thing that was a misstatement by Mr. Robinson about the record. The hearing on October 23, 2002, where Mr. Forster waives his right, it was noticed. Everybody knew what was going on, and I refer the Court to docket entry number 396, which is contained at page 110 of my excerpts of record. What that shows is the day before, on October 22, 2002, the parties met before Magistrate Judge Porter to take the Feretta waiver. And Magistrate Judge Porter said, you know what? I don't feel comfortable taking a Feretta waiver. I'm going to let Judge Whalen do it. And then they met the next day on October 23, 2002, and that's when Judge Whalen did the Feretta waiver. So everybody knew what was going to happen on that day. And you can just look at, again, my excerpt of record at page 110, and it's docket entry number 396. It says, minutes, enter order by Magistrate Judge Louisa S. Porter, motion hearing raid, defendant's oral motion to proceed pro se, set for 10-23-02 at 9 a.m. before Judge Whalen. That's exactly what happened. They went there. She didn't feel comfortable doing the Feretta waiver, so they put it over until the next day so that Judge Whalen could do it. Everybody knew what was going to happen. Was the government present at that time before the Magistrate Judge when it was put over? I don't have the transcript in front of me, but I read it, and I'm virtually positive that they were. And it would be highly unusual for them not to be present. Were you there? I was not the trial lawyer in the case. But that transcript is part of the record, and I remember reading it, and I remember that's exactly what happened is Judge Porter didn't feel comfortable doing the Feretta waiver. And I think the Court understands my position. Judge Whalen did an excellent job at the dangers and disadvantages, but we've got two big problems here. We have been well-briefed on both sides. Thank you. I think we have it. Thank you. Thank you for the extra time, Your Honor, because I think it's very, very important that I clear up some important parts. What my colleague on the government side pointed out, that this information led to the Title III application. Yes, it did. That exactly makes my point on the prejudice that came from this, these, what I call taps, what they call pen registers, and really what it is is somewhere between, because we don't know what information came from that. The second most important thing out of this is that don't confuse the numbers that they said that they get numbers back to analogizing to a phone number. What's in the affidavit there, those numbers go to specific pages of websites. A specific website, as I understand it from the affidavits, have lots of numbers that address them. They essentially point out a specific page of the website. It's not like a phone number of the website. And likewise, the information is blurred as to these packets that is pointed out in the declaration as to the information. The only software that's available was available, according to him, when he was at U.S. Customs, and it must have been used, although we don't know, because I don't have the court order, I don't have the affidavit as to what was submitted to get that court order. So I'm struggling in the dark, and I never received the materials that they got from the pen register, only afterwards the full e-mails there, so I don't know how it was limited. But the only software that was available gave all of what they call header materials, packet materials. That is, would include subject lines, would include CCDs, who it was CC'd to. And lots of other what they call metadata in the information there that gives a lot more information than just a phone number. And the fact that it led to the Title III application is the very point of the prejudice of having this and just doing it in the dark by calling it a pen register. Okay. Thank you. All right. Thank you, counsel. The case argued is submitted. We thank all counsel for their very good arguments, and we will stand in adjournment.
judges: Fisher, Clifton, Smith